**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |
|---|---|
| **STUFF ELECTRONICS (DONG GUAN) LIMITED and STUFF TECHNOLOGY LIMITED, et al.** | |
| **Plaintiffs/Counterclaim Defendants,** | **CIVIL ACTION NO.  20-4333** |
| **v.** | |
| **FOR YOUR EASE ONLY, INC., et al.** | |
| **Defendants/Counterclaim Plaintiffs.** | |

**RUFE, J.**                                                             **August 7, 2024**

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This is a dispute over who is entitled to the proceeds from the sale of phone chargers. Plaintiffs Stuff Technology Limited and Stuff Electronics (Dong Guan) Limited (collectively, "Stuff"), who manufactured the chargers, brought this litigation against For Your Ease Only, Inc. ("FYEO") and QVC, Inc.[1] seeking payment under a series of purchase orders. The relevant transactions were among Stuff, FYEO, QVC, and nonparty Thinium Technologies, LLC. Thinium (which went out of business) owned the technology for the chargers, and contracted with FYEO to sell them on QVC. After the lawsuit was filed, the Court granted Juno Financial, LLC—an outside investor in Thinium—leave to intervene under Federal Rule of Civil Procedure 24(a).[2] FYEO is in possession of approximately $453,000.00 central to the dispute.

Stuff asserts multiple claims against FYEO, including breach of contract with respect to certain purchase orders, breach of contract as to a representation agreement between Thinium

---

[1] QVC has been dismissed without prejudice as a party. *See* Order, Apr. 12, 2021 [Doc. No. 45].

[2] Order, Nov. 18, 2020 [Doc. No. 31].

and FYEO (to which Stuff claims it was a third-party beneficiary), a claim for an account stated, or in the alternative, breach of an implied contract, promissory estoppel, unjust enrichment, and fraudulent misrepresentation.[3] Stuff also raises two claims against Juno Financial for unjust enrichment and money had and received.[4]

Juno Financial, as a plaintiff-intervenor, asserts three claims against FYEO: breach of statutory duty to pay outstanding accounts, breach of contract, and tortious interference with existing contractual relationships. Juno Financial further brings one claim against Stuff for tortious interference with existing contractual relations.[5] Lastly, FYEO brings interpleader claims against Stuff and Juno under Rule 22 and 28 U.S.C. § 1335, while also seeking indemnification.[6]

After discovery and pretrial proceedings, the Court heard evidence and arguments of counsel during a non-jury trial. The Court now enters the following findings of fact in paragraph form and conclusions of law in discussion form pursuant to Rule 52(a).[7]

## I.   FINDINGS OF FACT

### A.    The Parties and Relevant Entities

1.      Thinium Technologies, LLC ("Thinium") was a company that developed and owned the intellectual property rights to manufacture and sell cordless chargers for mobile phones (the "Phone Chargers"). Thinium is not a party to this action.[8]

---

[3] *See* Stuff's Am. Compl. [Doc. No. 48-1] ¶¶ 70–137.

[4] *Id.*  ¶¶ 138–50.

[5] *See* Juno's Am. Compl.[Doc. No. 47-1] ¶¶ 43–75.

[6] *See* FYEO Answer to Stuff [Doc. No. 51] at 49–54; FYEO Answer to Juno[Doc. No. 49] at 28–34.

[7] To the extent not expressly ruled upon herein, any claims raised by the parties have been denied.

[8] Joint Pretrial Statement [Doc. No. 116] ¶ 1.

2.      Peter Greenberg was Thinium's CEO and a California resident.[9]

3.      Stuff Technology Limited ("STL"), a Hong Kong limited corporation, is a mobile and tablet accessories manufacturer. STL owns manufacturing plants in China and Vietnam and provides goods and services to global customers. Stuff Electronics (Dong Guan) Limited ("SEL"), a Chinese limited corporation with offices in China, is a manufacturer of mobile accessories and power electronics with a manufacturing facility in Shenzhen, China.[10]

4.      At all times relevant to this action, Henry Ma was the President of STL and SEL (collectively, "Stuff").[11]

5.      QVC, Inc. is a general merchandise retailer with offices in West Chester, Pennsylvania. QVC markets and sells a variety of goods directly to consumers, including through its television programs.[12]

6.      QVC sold the Phone Chargers to consumers and remitted the sales proceeds to For Your Ease Only, Inc. ("FYEO").[13] QVC is no longer a party to this action.[14]

7.      FYEO is an Illinois domestic corporation with offices in Chicago, Illinois.[15]

8.      FYEO served as a sales representative for Thinium in connection with the promotion of the Phone Chargers on QVC. FYEO promoted the Phone Chargers on live QVC television shows.[16]

---

[9] Joint Pretrial Statement ¶ 2.

[10] Joint Pretrial Statement ¶ 3.

[11] Joint Pretrial Statement ¶ 4.

[12] Joint Pretrial Statement ¶ 9.

[13] Joint Pretrial Statement ¶ 10.

[14] Joint Pretrial Statement ¶ 11.

[15] Joint Pretrial Statement ¶ 12.

[16] Joint Pretrial Statement ¶ 13.

9.     At all times relevant to this action, Dan Greiner was the CFO and co-owner of FYEO and oversaw its day-to-day operations.[17]

10.    FYEO is currently in possession of approximately $453,000.00, which represents the receivables from the June 2019 purchase orders for the Phone Chargers, minus FYEO's commission (the "Retained Funds").[18]

11.    Juno Financial, LLC ("Juno") is a Colorado limited liability company with its principal place of business in Denver, Colorado. Juno provides loans, including factoring loans, to small businesses that cannot obtain financing through traditional sources.[19]

12.    At all times relevant to this action, Dennis O'Carroll was the CEO of Juno.[20] Peter Freeman was also an employee of Juno.[21]

**B.     FYEO and QVC's Relationship**

13.    On March 6, 2001, FYEO and QVC entered into a written agreement (the "QVC Agreement"), in which FYEO agreed to present and promote products to QVC.[22]

14.    FYEO presented numerous products on QVC, including the Phone Chargers.[23]

**C.     FYEO and Thinium's Relationship**

15.    Thinium owned the patent for the Phone Chargers and contracted with FYEO to sell them on QVC.[24]

---

[17] Joint Pretrial Statement ¶ 14.

[18] Joint Pretrial Statement ¶ 15.

[19] Joint Pretrial Statement ¶ 5.

[20] Joint Pretrial Statement ¶ 7.

[21] Joint Pretrial Statement ¶ 8.

[22] JX-001; Joint Pretrial Statement ¶ 16.

[23] Trial Tr. Jan. 31, 2024 [Doc. No. 133] at 165.

[24] Trial Tr. Jan. 29, 2024 [Doc. No. 131] at 82; Trial Tr. Jan. 31, 2024 [Doc. No. 133] at 176.

16.     On December 15, 2014, Thinium and FYEO entered into a written exclusive representation agreement (the "Representation Agreement").[25]

17.     Under the Representation Agreement, FYEO served as a sales representative for Thinium's Phone Chargers on QVC. Specifically, FYEO would procure orders from QVC and transmit the orders to Thinium. Upon Thinium's acceptance of the orders, FYEO would present the product on air.[26] After QVC received payments from customers who purchased the product, FYEO would send an invoice to QVC, collect payment, and remit the proceeds minus FYEO's commission of 18% of the sale price.[27]

### D.     Thinium and Stuff's Initial Relationship

18.     In December 2014, Stuff began manufacturing the Phone Chargers for Thinium.[28]

19.     Stuff and Thinium did not enter into a master agreement related to Stuff's manufacturing of the Phone Chargers; rather, the relationship was governed by the terms of the purchase orders and invoices between the two companies.[29]

20.     Thinium issued purchase orders to Stuff to request production of a certain number of Phone Chargers. Once Stuff received and accepted a purchase order, Stuff manufactured the Phone Chargers and shipped them to QVC warehouses in the United States, as directed by the purchase orders.[30] After Stuff fulfilled a purchase order for the Phone Chargers, Stuff issued an invoice to Thinium.[31] Stuff was paid after delivery of the Phone Chargers, not before.

---

[25] JX-003; Joint Pretrial Statement ¶ 17; Trial Tr. Jan. 31, 2024 [Doc. No. 133] at 168.

[26] Trial Tr. Jan. 31, 2024 [Doc. No. 133] at 168–69.

[27] JX-003 at ¶ 3; Trial Tr. Jan. 31, 2024 [Doc. No. 133] at 171. There is also a 1.5% QVC social media fee. Trial Tr. Feb. 2, 2024 [Doc. No. 134] at 53.

[28] Joint Pretrial Statement ¶ 18.

[29] Trial Tr. Jan. 29, 2024 [Doc. No. 131] at 9–10; Joint Pretrial Statement ¶ 19.

[30] Joint Pretrial Statement ¶ 20.

[31] Trial Tr. Jan. 29, 2024 [Doc. No. 131] at 10.

21.     Neither QVC nor FYEO issued purchase orders directly to Stuff and Stuff never entered into a written contract with FYEO or QVC.

**E.     Thinium and Juno's Relationship**

22.     Before December 2017, Thinium received funding from Reichert Funding and Hatch Funding.[32]

23.     In December 2017, Thinium and Juno entered into three agreements: (1) an Accounts Receivable Purchase & Security Agreement;[33] (2) a Purchase Order Finance Agreement;[34] and (3) a Revolving Loan Note and Credit Agreement (collectively, the "Loan Documents").[35]

24.     Thinium agreed to grant Juno a security interest in the collateral—defined to include accounts, chattel paper, inventor, equipment, instruments, investment property—and Thinium authorized Juno to execute and file financing statements with respect to the collateral.[36]

25.     Juno paid off Thinium's remaining balance to Reichert through a buyout agreement which permitted Juno to terminate Reichert's existing UCC-1 Financing Statement and file its own UCC-1 Financing Statement.[37]

26.     In December 2017, Juno filed a UCC-1 Financing Statement[38] in Delaware, where Thinium was organized.[39]

---

[32] Trial Tr. Jan. 30, 2024 [Doc. No. 132] at 133.

[33] JX-010.

[34] JX-195; *see also* Joint Pretrial Statement ¶ 23.

[35] JX-01; *see also* Joint Pretrial Statement ¶ 22.

[36] JX-010.

[37] Trial Tr. Jan. 31, 2024 [Doc. No. 133] at 8–14; Trial Tr. Jan. 30, 2024 [Doc. No. 132] at 133–134; JX-009; JX-182; JX-185; JX-232.

[38] The UCC Financing Statement was subsequently revised to correct a typographical error in Thinium's name. JX-015.

[39] Trial Tr. Jan. 30, 2024 [Doc. No. 132] at 125–126; JX-015.

27.     According to Juno's UCC-1 Financing Statement, the collateral for Juno's

financing included:

> All assets of [Thinium], whether presently existing or hereafter created or
> acquired, and where located, including but not limited to (i) all of [Thinium's]
> accounts, accounts receivable, contract receivables, contract rights, notes, drafts,
> acceptances . . . (ii) all of [Thinium's] inventory, including all goods,
> merchandise, raw materials . . . now owned or hereafter acquired.[40]

28.     On December 28, 2017, Juno sent a Notice of Assignment and Change of Payee

("NOA") letter to Dan Greiner at FYEO. The NOA, signed by both Juno and Thinium, notified

FYEO that Juno was providing Thinium with a working capital line of credit pursuant to the

Loan Documents. The NOA stated in part:

> Client [Thinium] has assigned all present and future Accounts Receivable with
> your company [FYEO] to Juno Financial LLC . . . . This letter hereby instructs
> you to remit your payment of all invoices from client directly to Juno Financial,
> and to continue to do so until notified otherwise by Juno Financial. Payments
> made to any party except Juno will not relieve your obligation for Accounts
> Payable due Client [Thinium] and this notice may not be revoked except in
> writing by an officer of Juno Financial.[41]

29.      FYEO understood this language to mean that, until instructed otherwise, FYEO

should direct payment of Thinium's receivables to Juno.[42]

**F.     FYEO's Payment to Juno (January - October 2018)**

30.     In January 2018, Thinium sent Stuff four purchase orders pursuant to purchase

orders FYEO procured from QVC.[43]

---

[40] JX-015; Trial Tr. Jan. 30, 2024 [Doc. No. 132] at 125–128.

[41] *See* JX-012; Trial Tr. Jan. 30, 2024 [Doc. No. 132] at 128–129; Joint Pretrial Statement ¶ 25.

[42] Trial Tr. Jan. 31, 2024 [Doc. No. 133] at 187.

[43] JX-198, JX-199, JX-200, JX-201.

31.     From January to mid-October of 2018, FYEO remitted all receivables from these purchase orders to Juno, per the NOA.[44]

32.     In total, FYEO, per the NOA and at Thinium's request, sent cash payments totaling $1,389,655.08 to Juno.[45]

33.     Juno made payments on behalf of Thinium to Stuff once in December 2017 and twice in January 2018, and then ceased all further payments.[46] These payments were for prior orders fulfilled by Stuff.[47] Specifically, on December 29, 2017, Juno remitted $197,958.03 to Stuff.[48] Juno also issued payments of $189,416.50 to Stuff on January 5, 2018, and $24,519 on January 31, 2018.[49] Juno did not make any further payments to Stuff after these three payments.

34.     In the spring of 2018, both Juno and Stuff reached out to Thinium because each company was owed significant sums of money.

35.     On April 23, 2018, Joe Leung of Stuff emailed Mr. Greenberg of Thinium, stating that "Thinium product production is on hold due to serious payment issues to the suppliers. . . ."[50]

36.     In a follow up email on April 24, 2018, Mr. Leung wrote: "before there is a BIG payment coming from QVC but ended up nothing."[51] He continued, "[1] Why QVC did not make payment? [2] What is QVC outstanding payment? [3] When do you expect to receive it?

---

[44] Joint Pretrial Statement ¶ 26.

[45] JX-004; Trial Tr. Jan. 31, 2024 [Doc. No. 133] at 71.

[46] JX-006; JX-017.

[47] Trial Tr. Jan. 29, 2024 [Doc. No. 131] at 14–15; 88–89; Trial Tr. Jan. 30, 2024 [Doc. No. 132] at 8–9.

[48] JX-006.

[49] JX-017.

[50] JX-026.

[51] JX-026.

[4] What is the problem of Juno now? [5] Is it also payment through by Juno to us or payment through by Thinium to us directly now?"[52]

37.     Mr. Greenberg responded on April 25, 2018, stating, "You have to be a little more patient for a couple more days I'm trying as hard as I can to get as much money to you."[53]

38.     Mr. Ma and Mr. Leung believed that QVC had not remitted payment for previous purchase orders.[54] However, QVC paid FYEO, and FYEO then sent the payments to Juno (less FYEO's commission).[55]

39.     On May 18, 2018, Mr. Freeman of Juno told Mr. Greenberg that he knew that Thinium "need[s] operating capital to pay the factory. However, we cannot fund POs [purchase orders] until you cure the default (remainder of QVC invoice aged over 90 days). We are not comfortable providing PO financing against POs that are not being paid on time."[56]

**G.     FYEO Begins Using the Assignment Instructions to Stuff**

40.     In June 2018, QVC issued additional purchase orders to FYEO.[57] However, Thinium told FYEO that it could not accept the orders because it was having difficulty paying Stuff for past manufacturing of Phone Chargers.[58] FYEO's Mr. Greiner recommended that Thinium sell the existing inventory of Phone Chargers.[59] However, Stuff would not ship the Phone Chargers in its inventory because it had not received payment on past purchase orders.[60]

---

[52] JX-026.

[53] JX-026.

[54] Trial Tr. Jan. 29, 2024 [Doc. No. 131] at 24, 27.

[55] JX-063; Trial Tr. Jan. 29, 2024 [Doc. No. 131] at 27.

[56] JX-029.

[57] Trial Tr. Feb. 2, 2024 [Doc. No. 134] at 67–68.

[58] JX-032; Trial Tr. Feb. 2, 2024 [Doc. No. 134] at 68.

[59] JX-032.

[60] Trial Tr. Feb. 2, 2024 [Doc. No. 134] at 70.

41.     Due to Thinium's severe cash flow issues, FYEO, Thinium, Stuff, and Juno engaged in numerous conversations and emails regarding payment and future purchase orders.

42.     In July 2018, Mr. O'Carroll and Mr. Freeman of Juno and Mr. Ma of Stuff had a phone call to discuss the fact that Stuff had not been paid.[61]

43.     In August 2018, Mr. Ma met with Mr. Greenberg of Thinium in Los Angeles to discuss Stuff's concerns. At the meeting, Thinium proposed that future purchase orders be paid directly to Stuff to help pay off the 2018 invoices.[62]

44.     Juno was not represented at the meeting. However, at some point in the summer of 2018, Mr. O'Carroll of Juno had a discussion with Mr. Greenberg of Thinium about payments being sent directly to Stuff.[63]

45.     Separately, in 2018, Mr. Greiner also had a conversation with Juno's Mr. Freeman in which Juno agreed that FYEO had to pay Stuff to keep Thinium going.[64]

46.     In October 2018, in order to move forward with the plan to pay Stuff, Thinium's Mr. Greenberg suggested to Mr. Greiner that QVC issue a purchase order directly to Stuff.[65]

47.     Mr. Greiner replied to Mr. Greenberg, stating, "You gotta work it out that the PO is not issued to them."[66] Mr. Greiner stated in his email that QVC could not issue a purchase order directly to Stuff because "[t]hey are not a verified vendor, it cuts Lori [Greiner, the

---

[61] Trial Tr. Jan. 31, 2024 [Doc. No. 133] at 58.

[62] Trial Tr. Jan. 29, 2024 [Doc. No. 131] at 28.

[63] Trial Tr. Jan. 31, 2024 [Doc. No. 133] at 129–130.

[64] Trial Tr. Feb. 2, 2024 [Doc. No. 134] at 7–8.

[65] JX-053.

[66] JX-053.

principal of FYEO] out, and creates a legal relationship with QVC. We can't get terms Lori gets with a new vendor."[67]

48.     On October 12, 2018, via email, FYEO told Thinium that it could "instruct us to send payments" to Stuff, but "only in accordance with terms . . . ."[68] Thinium responded "that should work."[69] Mr. Greiner agreed to include payment information on the purchase orders indicating that the receivables were to be sent to Stuff.[70]

49.     On October 12, 2018, FYEO's Mr. Greiner asked Thinium's Mr. Greenberg if Juno was "on board with any plan that [he] would start making payments to [Stuff]?" to which Thinium responded, "Yes. Juno on new POs they understand."[71]

50.     On October 15, 2018, Mr. Greenberg wrote to Mr. Ma asking if Stuff would agree to ship more Phone Chargers if FYEO released a 30% advance to Stuff, with the remainder of the balance released upon the sale of the goods over the holidays.[72] Thinium told Stuff that Thinium's name would be kept on the purchase orders but that they were all in agreement that the purchase orders would include assignment instructions directing all payments to Stuff.[73]

51.     By October 16, 2018, after further discussion between the parties, Stuff agreed with this plan: FYEO would continue to procure purchase orders from QVC on behalf of Thinium (and not Stuff), but only on the condition that the receivables be paid "ONLY TO

---

[67] JX-053.

[68] JX-047.

[69] JX-047.

[70] JX-053.

[71] JX-045.

[72] JX-053.

[73] JX-053.

[Stuff]."[74] The parties also agreed that Stuff would receive an upfront deposit payment from

FYEO of 30%.[75]

52.    Stuff never communicated directly with QVC.[76]

53.    Thereafter, FYEO and Thinium agreed to include the following assignment

language to future POs:

> The receivables from this PO and the invoices arising from this PO has been
> assigned to Stuff Technology Limited. The payment information for the
> receivables are as follows:
>
> Beneficiary Name: Stuff Technology Limited
> Beneficiary Address: Flat / RM G09, Enterprise Place, Phase One, HK Science
> Park . . .
>
> Upon approval of PO there will be a 30% deposit required to accept purchase
> order. If there is any change of above payment agreement or payment/wire
> information, approval by Stuff Technology Limited is required.[77]

### H.    October and November 2018 Purchase Orders

54.    On October 22, 2018, FYEO advised Juno that it issued a wire to Juno for "the

entire open balance for Thinium."[78]

55.    In October 2018, FYEO procured a purchase order from QVC and added the new

Assignment Instructions to the purchase order before sending the purchase order to Thinium.[79]

56.    On October 26, 2018, FYEO transmitted the purchase order to Thinium.[80]

Thinium sent a purchase order to Stuff, which Stuff accepted. On October 27, 2018, Mr. Greiner

---

[74] JX-054.

[75] JX-058.

[76] Trial Tr. Jan. 30, 2024 [Doc. No. 132] at 65.

[77] JX-058; JX-065; JX-105.

[78] JX-056.

[79] Trial Tr. Feb. 2, 2024 [Doc. No. 134] at 9–10.

[80] JX-065.

told Mr. Greenberg and Mr. Ma that FYEO had paid a 30% deposit to Stuff per the Assignment Instructions.[81] Stuff then produced and shipped the Phone Chargers that were the subject of the October 2018 purchase order.[82]

57.     Stuff submitted its invoice for the October 2018 order to Thinium.[83] Thinium then invoiced FYEO, which invoiced QVC. After the phone chargers were sold and QVC issued payment to FYEO, FYEO remitted to Stuff the remaining balance on its invoice for the October 2018 transaction per the Assignment Instructions.[84] While the October 2018 order was paid in full, Stuff was still owed a significant amount of money for manufacturing the Phone Chargers on past purchase orders.

58.     On November 27, 2018, FYEO informed Juno that it was "dealing directly with [Stuff] on [the October 2018] units and this PO. We had to make a deposit directly to [Stuff]."[85] FYEO attached the invoice for the October 2018 Transaction that contained the Assignment Instructions. Juno did not object to the Assignment Instructions.

59.     On November 27, 2018, Mr. Freeman sent an email titled "Check In" to Mr. Ma asking "to have a call with you to check in about the way forward for Thinium. We know that you are owed some money, as are we."[86]

---

[81] JX-073; JX-231.

[82] Trial Tr. Jan 29, 2024 [Doc. No. 131] at 41.

[83] JX-207.

[84] JX-228; JX-231; Trial Tr. Jan. 29, 2024 [Doc. No. 131] at 42.

[85] JX-082.

[86] JX-081.

60.     In November 2018, FYEO procured another purchase order from QVC, inserted the Assignment Instructions, and transmitted it to Thinium.[87] On November 29, 2018, FYEO wired Stuff the 30% deposit.[88]

61.     Stuff produced and shipped the Phone Chargers[89] and submitted its invoice to Thinium for the November 2018 Purchase Order.[90]

62.     On December 17, 2018, FYEO provided Juno with a list of the remaining remittances due to Stuff under the October 2018 transaction and the November 2018 transaction, identified as its "balance open to pay the Factory."[91] FYEO advised that it planned to wire Stuff the October 2018 transaction remaining balance of $250,908.84 "in the next few days." Juno did not respond with any objection.

63.     After the phone chargers were sold and payment was sent to FYEO, FYEO again remitted to Stuff the remaining balance on its invoice per the Assignment Instructions for the November 2018 transaction.[92]

**I.     June 2019 Purchase Orders**

64.     On April 4, 2019, Kirsten Robertson of FYEO emailed Mr. Greenberg about the cost of an updated version of the Phone Chargers.[93] On April 5, 2019, Ms. Robertson followed

---

[87] JX-084.

[88] JX-228.

[89] Trial Tr. Jan. 29, 2024 [Doc. No. 131] at 44–45.

[90] JX-210.

[91] JX-087.

[92] JX-228; JX-231; Trial Tr. Jan. 29, 2024 [Doc. No. 131] at 45.

[93] JX-097.

up by writing, "we will need to go back to paying Thinium for product again with the start of these new orders."[94] Mr. Greenberg responded that Stuff wanted to be paid directly.[95]

65.     Mr. Greiner responded to the email thread on April 6, 2019, stating, "Okay we/QVC will issue PO to Thinium AND as always Thinium has all responsivities [*sic*] and liabilities of the PO as usual, but Thinium can direct us to make the payment at their request where ever they want . . . so we can proceed."[96]

66.     In June 2019, FYEO procured ten purchase orders from QVC for Phone Chargers and added the Assignment Instructions.[97]  FYEO sent the purchase orders to Thinium, who sent the purchase orders to Stuff.

67.     On June 3, 2019, Thinium emailed Juno that Stuff would accept the purchase orders and asked to set up a call.[98] Juno's Mr. Freeman responded on June 5, 2019: "Thanks, Peter. What time works this week to talk?"[99] Juno did not object to new purchase orders being sent to Stuff.

68.     On June 24, 2019, Mr. Greenberg forwarded the June 2019 purchase orders to Juno's Mr. O'Carroll and Mr. Freeman.[100] The purchase orders contained the Assignment Instructions to Stuff. Mr. O'Carroll did not object to the Assignment Instructions, nor did he

---

[94] JX-097.

[95] JX-097.

[96] JX-097.

[97] JX-105.

[98] JX-102.

[99] JX-102.

[100] JX-109.

speak to Mr. Greiner after this until the end of September 2019 to tell him not to follow the payment instructions on the June 2019 purchase orders.[101]

69.     Per the Assignment Instructions, on June 25, 2019, FYEO wired Stuff the 30% deposit of $195,426.02, and FYEO then informed Stuff of the wire.[102] Mr. O'Carroll knew about the 30% deposit and did not object.[103]

70.     Stuff accepted and fulfilled the June 2019 purchase orders by shipping the Phone Chargers[104] to QVC warehouses.[105] Stuff submitted its invoice to Thinium related to the purchase orders.[106] QVC sold the Phone Chargers, after which FYEO sent invoices to QVC.[107]

71.     On August 21, 2019, Thinium sent Juno a copy of the invoices related to the June 2019 Transaction, and informed Juno that FYEO had sent Stuff the 30%.[108] The invoices again contained the Assignment Instructions. Juno did not object.[109]

72.     In August 2019, Thinium, Stuff and FYEO corresponded about the proper labels to be placed on the phone chargers for the June 2019 transaction.[110]

73.     In September 2019, Stuff and FYEO communicated directly to ensure that the shipments were on schedule for the June 2019 transactions.[111]

---

[101] Trial Tr. Jan. 31, 2024 [Doc. No. 133] at 98.

[102] JX-111; JX-228; JX-231.

[103] Trial Tr. Jan. 31, 2024 [Doc. No. 133] at 98–99.

[104] The Phone Chargers for this PO were a new model ReCharge, which had a larger battery capacity and cost more money per unit. *See* Trial Tr. Jan 29, 2024 [Doc. No. 131] at 48–49.

[105] Trial Tr. Jan. 29, 2024 [Doc. No. 131] at 55.

[106] JX-220.

[107] JX-216.

[108] JX-115.

[109] Trial Tr. Jan. 31, 2024 [Doc. No. 133] at 98.

[110] JX-118.

[111] JX-117.

74.     QVC paid FYEO's invoices in full starting in November 2019 and ending in January 2020, totaling $779,728.76.[112]

75.     From these payments, FYEO took its commission, and also recouped the 30% deposit FYEO had paid to Stuff.[113] The remaining funds—approximately $453,000.00—are being held by FYEO.

**J.     Actions Related to Juno's NOA**

76.     Since at least December 2017, Juno knew that Thinium owed Stuff money for the materials and manufacturing of the Phone Chargers.[114]

77.     On October 16, 2019, Thinium's Mr. Greenberg wrote to Juno's Mr. O'Carroll:

Henry [Ma] is going to be billed for the air shipments for two big deliveries that he will owe to air tiger [*sic*] and is expecting to pay from these invoices. I am not sure he will even agree to this but what if we gave 100k to [*sic*] per invoice? Again, this is not for sure and would have to be agreed to by Henry. Or some payout to Juno[.] It's a very difficult position for all , I am just thinking out loud[.][115]

78.     In the same email thread, Mr. O'Carroll wrote: "If we were to get $100k from each set of invoices for a total of $200k, then we would continue working with you to resolve this over time."[116]

79.     When Mr. Greenberg responded, "Let me discuss with Henry [Ma] after the product is shipped," Mr. O'Carroll stated, "Agreed, you should wait until the goods have been

---

[112] JX-188.

[113] Joint Pretrial Statement ¶ 45.

[114] Trial Tr. Jan. 30, 2024 [Doc. No. 132] at 113–114.

[115] JX-128.

[116] JX-128.

received by QVC."[117] Mr. O'Carroll encouraged Mr. Greenberg not to inform Stuff of the NOA until Stuff fronted the costs of materials, manufacturing, and shipping of the Phone Chargers.

80.     On November 11, 2019, Mr. Greenberg drafted an email to Mr. Ma, which revealed the NOA language to Stuff for the first time, and sent it to Mr. O'Carroll for review.[118] Mr. Greenberg wrote, in relevant part, "Juno has let us continue without pressing us over the past year for any payments so we can receive orders and continue to build our relationship and business with FYEO and QVC. Dennis has agreed to split the payments between Stuff and Juno on the outstanding balances due from the October and November [2019] shipments." The draft email stated that Mr. Greenberg "knew this [was] a big surprise."[119]

81.     Mr. O'Carroll reviewed the draft email and responded, "This is pretty good. The only thing to add is the split of the 2nd invoice. Once you add that, please send to Henry and BCC me. Then you and I will need to go to FYEO and explain how the payments are to be made."[120]

82.     Mr. Greenberg sent a slightly modified version of this email to Mr. Ma a few days later.[121]

83.     Mr. Ma responded on November 18, 2019, that "[i]t is not only a surprise[] to me but a fraud between you, Lori (FYEO) and QVC."[122]

---

[117] JX-128.

[118] JX-131.

[119] JX-131.

[120] JX-131.

[121] JX-133.

[122] JX-135.

84.     By November 2019, Stuff told Juno that Thinium owed Stuff approximately $800,000 in unpaid invoices.[123]

85.     Prior to November 2019, Juno did not send a copy of the NOA to Stuff.[124]

86.     On November 20, 2019, in an email informing Mr. Greiner that there was a dispute between Juno and Stuff over the Retained Funds, Mr. Greenberg wrote:

> As I mentioned at this point Jeff [Rudes] and I do not want any payments yo [sic] go out until we can figure out with our council [sic] the first obligation and to who. We now believe Stuff our factory should receive the Payments but I need to go thru this with our attorney as well.[125]

87.     On May 28, 2020, Mr. Greenberg emailed Mr. Greiner stating:

> I believe that Juno had a plan, they intended ALL ALONG to let the product be produced and shipped and then enforce their [loan documents] once the product was out of Stuff's control. In the [loan documents], I had signed with them that all funds are to be sent to Juno for distribution. However, once Stuff insisted ALL payments go directly to them I immediately informed Juno, all I have is verbal communication Juno knew and accepted this.[126]

88.     Mr. O'Carroll actively encouraged Thinium to continue Stuff's production of the Phone Chargers by sending Stuff the receivables on the October and November 2018 purchase orders, as he believed this was the best path forward for Juno to get paid.[127]

89.     Juno was aware that Stuff would not manufacture the Phone Chargers without being paid.

**K.     Thinium's Overall Debt to Juno**

90.     As of May 31, 2018, Juno declared Thinium in default under the loan facilities.[128]

---

[123] JX-135.

[124] Trial Tr. Jan. 31, 2024 [Doc. No. 133] at 80.

[125] JX-138.

[126] JX-173.

[127] Trial Tr. Jan. 31, 2024 [Doc. No. 133] at 136.

[128] *See* JX-185; Trial Tr. Jan. 31, 2024 [Doc. No. 133] at 24, 70.

91. In total, FYEO, on behalf of Thinium, made payments totaling $1,389,655.08 to Juno.[129]

92. Juno advanced $1,517,361.40 to Thinium.[130]

93. The difference between FYEO's total payments to Juno and Juno's advances on behalf of Thinium is $127,706.32.[131]

**L.    Dispute Over the Retained Funds**

94. In February 2021, more than a year after receiving payment from QVC for the June 2019 purchase orders, FYEO segregated approximately $453,000.00 into a money market account (the "Retained Funds"), which represents proceeds related to the QVC purchase orders from June 2019.[132]

95. FYEO has recouped the 30% deposit it provided Stuff and taken out its 18% commission from the Funds.

## II.    CONCLUSIONS OF LAW

**A.    Stuff's Claims against FYEO**

1.    <u>Breach of Contract of June 2019 Purchase Orders</u>

Stuff asserts a breach of contract claim against FYEO for failing to send the receivables from the June 2019 purchase orders to Stuff.[133] To prevail on a breach of contract claim under Pennsylvania law, a plaintiff must establish "(1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract, and (3) result[ing] damages."[134]

---

[129] JX-004; Trial Tr. Jan. 31, 2024 [Doc. No. 133] at 71.

[130] Trial Tr. Jan. 31, 2024 [Doc. No. 133] at 72–74.

[131] Trial Tr. Jan. 31, 2024 [Doc. No. 133] at 74–75. Juno claims that Thinium owes it $548,734.91 due to interest, default interest, and other fees. Trial Tr. Jan. 31, 2024 [Doc. No. 133] at 42, 78.

[132] JX-226.

[133] JX-105.

[134] *Ware v. Rodale Press, Inc.*, 322 F.3d 218, 225 (3d Cir. 2003) (brackets and citation omitted).

To establish the existence of a contract one must show that: (1) both parties manifested an intention to be bound by the terms of the agreement; (2) the terms of the agreement are sufficiently definite to be specifically enforced; and, (3) there is mutuality of consideration.[135]

Stuff asserts that it is a third-party beneficiary under the June 2019 purchase orders.[136] The Representation Agreement between Thinium and FYEO required FYEO to "use commercially reasonable efforts to solicit and procure orders for the Products from QVC and shall transmit all such orders to Company [Thinium] for acceptance or rejection . . . ."[137] FYEO incorrectly argues that the June 2019 purchase orders are solely between QVC and FYEO. Instead, after FYEO accepted the purchase orders from QVC, added the Assignment Instructions designating Stuff as the beneficiary of the receivables, and transmitted the revised purchase orders to Thinium for approval, they became contracts between Thinium and FYEO pursuant to the terms of the Representation Agreement.[138] Thinium then sent these purchase orders to Stuff for Stuff's acceptance, after which FYEO remitted the 30% deposit to Stuff.

In order to establish third-party beneficiary status to a contract to which a plaintiff was not a party, the plaintiff must establish facts that show that the contracting parties intended to benefit the third-party when they executed the contract.[139] In Pennsylvania, there are two tests to determine if an entity is a third-party beneficiary.[140] Under the first test, both parties to the contract must have indicated "in the contract itself that the purported third party beneficiary is a

---

[135] *Ecore Int'l, Inc. v. Downey*, 343 F. Supp. 3d 459, 487 (E.D. Pa. 2018) (citations omitted).

[136] Am. Compl. [Doc. No.48-1] ¶ 74.

[137] JX-003.

[138] JX-105.

[139] *Wawrzynek v. Statprobe, Inc.*, 422 F. Supp. 2d 474, 483 (E.D. Pa. 2005).

[140] *In re 23S23 Const., Inc.*, 445 B.R. 417, 421 (Bankr. E.D. Pa. 2010) (citation omitted).

third party beneficiary."[141] When the third-party beneficiary status is not expressly written into the contract, the Court must apply the second test, which proceeds in two parts: "(1) the recognition of the beneficiary's right must be appropriate to effectuate the intention of the parties, and (2) the performance must satisfy an obligation of the promisee to pay money to the beneficiary or the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance."[142]

The intent of the parties for Stuff to be a third-party beneficiary is expressly written on the face of the June 2019 purchase orders.[143] Each June 2019 purchase order included the Assignment Instructions, which read:

> The receivables from this PO and the invoices arising from this PO has [*sic*] been assigned to Stuff Technology Limited. The payment information for the receivables are as follows:
>
> **Beneficiary Name**: Stuff Technology Limited
> **Beneficiary Address**: Flat / RM G09, Enterprise Place, Phase One, HK Science Park . . .
>
> Upon approval of PO there will be a 30% deposit required to accept purchase order. If there is any change of above payment agreement or payment/wire information, approval by Stuff Technology Limited is required.[144]

FYEO expressly designated Stuff as the "beneficiary" in the June 2019 purchase orders sent to Thinium.[145] Furthermore, Stuff's beneficiary status is appropriate to effectuate the intention of the parties. FYEO argues that Stuff cannot be a third-party beneficiary to the

---

[141] *Id.* at 421.

[142] *Guy v. Liederbach*, 459 A.2d 744, 751 (Pa. 1983) (internal quotations omitted); *see also Weiser v. Great Am. Ins. Co.*, 453 F. Supp. 3d 711, 716 (E.D. Pa. 2020) (citation omitted).

[143] FYEO fails to address the fact that Stuff's beneficiary status is written on the face of the purchase orders. *See* Def.'s Resp. [Doc. No. 142] at 51.

[144] JX-105 (emphasis added).

[145] These purchase orders were later sent to Juno, who did not object to the Assignment Instructions. JX-109.

purchase orders because (1) FYEO only placed the Assignment Instructions into the purchase orders as a favor to Thinium and (2) Stuff initially drafted the Assignment Instructions.[146] These facts are immaterial, as FYEO agreed to this proposal and placed the Assignment Instructions into each individual June 2019 purchase order before sending them to Thinium for approval. FYEO cannot evade liability when it affirmatively incorporated the Assignment Instructions into the purchase orders and paid the 30% deposit directly to Stuff. All parties understood that Stuff would not continue to manufacture the Phone Chargers otherwise. Thinium requested that FYEO add the Assignment Instructions to the purchase orders; FYEO agreed to this proposal and carried out the agreed-upon terms. Therefore, the evidence establishes that (1) the recognition of Stuff's beneficiary right is appropriate to effectuate the intention of both FYEO and Thinium, and (2) the remittance of the Retained Funds to Stuff satisfies the obligation of FYEO to pay money to Stuff.

### B.   Stuff's Claims Against Juno

#### 1.   Unjust Enrichment

Stuff asserts that Juno was unjustly enriched by retaining the receivables (per the NOA) from the January 2018 purchase orders that Thinium sent to Stuff.[147] Stuff performed labor under the 2018 purchase orders and invoiced Thinium for its work. During this timeframe, Juno obtained all the receivables, but only made payments on behalf of Thinium directly to Stuff once in December 2017 and twice in January 2018.[148] Stuff asserts that Juno is only entitled to the

---

[146] Def.'s Resp. [Doc. No. 142] at 49–53.

[147] Juno asserts that such a claim is barred because "Stuff's unjust enrichment is not based upon any contract between Stuff and Juno and, instead, is a tort-like claim that is subject to a two (2) year statute of limitations." Intervenor Pl. Juno's Resp. [Doc. No. 145] at ¶ 115. Juno is incorrect. A four-year statute of limitations applies to claims under the quasi-contractual theory of unjust enrichment. 42 Pa. Cons.Stat. § 5525(4); *Gannon v. Nat'l R.R. Passenger Corp.*, No. 03-4501, 2004 WL 1274384 (E.D. Pa. June 10, 2004). Stuff's 2020 filing of its action was well within this timeframe.

[148] JX-006; JX-017.

"2018 Thinium profits" under its security interest, instead of the "2018 Thinium profits" *and* the amount owed to Stuff in the invoices. According to Stuff, "Juno should have paid . . . Stuff for its work and expenses incurred in fulfilling the January 2018 Transaction, in the same manner it had previously sent three separate payments to Stuff from December 27, 2017 to January 31, 2018."[149]

Where unjust enrichment is found, the law implies a contract, which requires the defendant to pay to the plaintiff the value of the benefit conferred.[150] "The elements necessary to prove unjust enrichment are: (1) benefits conferred on defendant by plaintiff; (2) appreciation of such benefits by defendant; and (3) acceptance and retention of such benefits under such circumstances that it would be inequitable for defendant to retain the benefit without payment of value."[151] The most important factor in determining if unjust enrichment applies is whether the enrichment of the defendant is *unjust*.[152]

Stuff conferred a benefit on behalf of Juno by manufacturing the Phone Chargers and shipping them to QVC. However, Stuff has failed to produce evidence that it would be inequitable for Juno to retain these funds. Juno had a perfected security interest in the funds and, at this time, had not waived said interest. There is a dearth of evidence to prove that the amount retained by Juno was unjust, given its significant advance of funds to Thinium. Since both Juno

---

[149] *See* Pl.'s Proposed Findings of Fact and Conclusions of Law [Doc. No. 139] at 42.

[150] *Durst v. Milroy Gen. Contracting, Inc.*, 52 A.3d 357, 360 (Pa. Super. Ct. 2012).

[151] *Id.*

[152] *Schenck v. K.E. David, Ltd.,* 666 A.2d 327, 328 (Pa. Super Ct. 1995); *Durst*, 52 A.3d at 360; *see also Torchia ex rel. Torchia v. Torchia*, 499 A.2d 581, 582 (Pa. Super. Ct. 1985) ("To sustain a claim of unjust enrichment, a claimant must show that the party against whom recovery is sought either 'wrongfully secured or passively received a benefit that it would be unconscionable for her to retain.'") (quoting *Roman Mosaic & Tile Co. v. Vollrath*, 313 A.2d 305, 307 (Pa. Super. Ct. 1973) (emphasis added)).

and Stuff were owed a significant amount of money from Thinium, Juno's retention of the receivables would not be unjust.

        2.    <u>Money Had and Received</u>

A plaintiff asserting a claim for money had and received can recover money paid to a defendant where (1) the money had been paid by mistake or under compulsion, or (2) the consideration was insufficient.[153] A claim for money had and received "entitles a party to relief where money is wrongfully diverted from its proper use and that money subsequently falls into the hands of a third person who has not given valuable consideration for it."[154] "[I]t makes no difference that it is from someone other than the plaintiff that the defendant received the money."[155]

FYEO did not send Juno the receivables by mistake or under compulsion nor did Juno provide insufficient consideration. FYEO remitted the receivables to Juno per the NOA and at Thinium's request. No evidence was presented at trial to demonstrate that Juno was responsible for sending a portion of these receivables to Stuff. Lastly, the NOA was put in place after Juno bought out Thinium's previous lender and provided a working line of capital to Thinium—there was not insufficient consideration for said payments.

---

[153] *Victaulic Co. v. HiTHerm, LLC*, No. 21-CV-5077, 2022 WL 2953690, at *4 (E.D. Pa. July 26, 2022) (quoting *Takeda Pharms. USA, Inc. v. Spireas*, No. CV 17-0452, 2017 WL 4401988, at *19 (E.D. Pa. Oct. 3, 2017)).

[154]  *Solomon v. Gibson*, 615 A.2d 367, 369 (Pa. Super. Ct. 1992).

[155] *Hughey v. Robert Beech Assocs.*, 378 A.2d 425, 427 (Pa. Super. Ct. 1977) (citation omitted).

C.      **Juno's Claims Against FYEO**

1.      Breach of Contract[156]

Juno asserts that it is entitled to the retained funds because FYEO breached its contract

under the Notice of Assignment (NOA), as well as under § 9-406 of the Uniform Commercial

Code ("UCC"), when FYEO made payments to Stuff without seeking prior written consent from

Juno. Section 9-406(a) states:

> [A]n account debtor on an account . . . may discharge its obligation by paying the
> assignor . . . until the account debtor receives a notification . . . that the amount
> due . . . has been assigned and that payment is to be made to the assignee. After
> receipt of the notification, the account debtor may discharge its obligation by
> paying the assignee and may not discharge the obligation by paying the assignor.

Juno sent FYEO the NOA on December 28, 2017, which stated in part:

> Accordingly, Client [Thinium] has assigned all present and future Accounts
> Receivable with your company to Juno Financial LLC . . . This letter hereby
> instructs you to remit your payment of all invoices from Client directly to Juno
> Financial, and to continue to do so until notified otherwise by Juno Financial.
> Payments made to any party except Juno will not relieve your obligation for
> Accounts Payable due Client [Thinium] and this notice may not be revoked
> except in writing by an officer of Juno Financial.[157]

FYEO and Stuff argue that Juno waived its interest in the June 2019 receivables by

affirmatively encouraging payment to Stuff for the October 2018, November 2018, and June

2019 purchase orders. "Waiver . . . is 'the intentional relinquishment of a known right.'"[158]

---

[156] Juno's claim for breach of statutory duty to pay outstanding accounts also fails because such a claim does not
exist. *See KORE Cap. Corp. v. StoneMor Operating LLC*, 608 F. Supp. 3d 208, 212–13 (E.D. Pa. 2022) ("[T]he
UCC does not allow for a private right of action . . . The purpose of a notice of assignment is to defeat the account
debtor's defense that it has satisfied the debt, not to create a freestanding cause of action for disregarding the notice.
[A]n assignee who has provided notice under section 9-406 has other remedies available when an account debtor
pays the assignor and refuses to pay the assignee . . . One of these remedies is a breach of contract claim.") (internal
quotations omitted). In response to FYEO's Proposed Findings of Fact and Conclusions of Law, Juno has conceded
this point. *See* Intervenor Pl. Juno's Rebuttal Resp. [Doc. No. 147] at 1 ("Juno is no longer pursuing i[t]s claim for
breach of statutory duty, as admittedly no private right of action exists.").

[157] JX-012; Trial Tr. Jan. 30, 2024 [Doc. No. 132] at 128–129; JX-012; Joint Pretrial Statement ¶ 25.

[158] *Mun. Auth. of Westmoreland Cnty. v. CNX Gas Co., LLC*, 380 F. Supp. 3d 464, 470 (W.D. Pa. 2019) (quoting
*Stoner v. Stoner,* 819 A.2d 529, 532 n.4 (Pa. 2003)).

"Waiver may be express or it may be implied by a party's unequivocal conduct demonstrating an intent to relinquish a known right."[159] As courts in other jurisdictions have held, "[a]n assignee waives its rights if it fails to protest the account debtor's remittance of funds directly to the assignor."[160] "If it can be established at trial that plaintiff had notice of the indirect payment to the assignor, plaintiff may have impliedly waived the direct payment requirement under the assignment by permitting the account debtor to remit payment to the assignor over a substantial period of time."[161]

There is no dispute that FYEO received the NOA from Juno. However, FYEO has sustained its burden of demonstrating that Juno waived its right to the receivables when it continuously encouraged payments to Stuff, the manufacturer of the goods. Juno not only failed to object to the October and November 2018 payments, but evidence was presented at trial that it actively encouraged payment to Stuff.

Juno had known about the assignment to Stuff since the fall of 2018, but did not object for nearly a year.  In November and December of 2018, FYEO proactively reached out to Juno to inform them that they planned to submit payment to Stuff pursuant to the new Assignment Instructions. Juno did not object. In June 2019, Mr. O'Carroll became aware that FYEO was going to remit the 30% deposit to Stuff for the June 2019 purchase orders, as had been done for the October and November 2018 purchase orders. Mr. O'Carroll received a copy of the June

---

[159] *Westmoreland*, 380 F. Supp. 3d at 470; *see also Prime Medica Assocs. v. Valley Forge Ins. Co.*, 970 A.2d 1149, 1156 (Pa. Super. Ct. 2009).

[160] *King v. Tuxedo Enters., Inc.*, 975 F. Supp. 448, 454 (E.D. N.Y. 1997).

[161] *Gen. Motors Acceptance Corp. v. Clifton-Fine Cent. Sch. Dist.*, 647 N.E.2d 1329, 1331 (N.Y. 1995) (denying summary judgment because there were material issues of fact as to whether plaintiff waived its rights under the assignment by failing to protest a direct payment – the account debtor's payment for prior school bus purchases to the assignor and the assignee's apparent failure to protest or direct that payment be made directly to it raised issues of fact as to whether the assignee waived its rights under the assignment); *see also Allstate Fin. Corp. v. Dundee Mills,* 800 F.2d 1073, 1076 (11th Cir. 1986) (assignee waived its rights by acquiescing in seven payments to assignor and not demanding reimbursement from debtor until later).

2019 purchase orders in late June 2019. Again, Juno did not object to this arrangement. Until September 2019, Juno did not take any action to stop FYEO from remitting payments to Stuff.[162]

Juno argues that inaction is insufficient to establish waiver. However, the evidence establishes that Juno did not merely acquiesce. Juno actively encouraged FYEO to remit receivables to Stuff. Mr. O'Carroll saw Stuff's continued production of the Phone Chargers as the only path forward for them. Juno continued to keep tabs on the production and sale of the Phone Chargers throughout 2018 by reaching out to Thinium and FYEO. Mr. O'Carroll "encouraged Thinium to find ways to continue to produce products because more sales coming in would create cash flow for all parties involved."[163]

Lastly, Juno argues that even if it waived its contractual right temporarily, a party may "later retract that waiver and demand strict compliance with the provision going forward."[164] However, retraction of a waiver is impermissible if "the retraction would be unjust in light of a material change in position undertaken in reliance on the waiver."[165] As was the case here, Stuff relied on the waiver, as it continued to front significant material and manufacturing costs under the assumption that they would be remitted the June 2019 receivables, as it had been on the October and November 2018 purchase orders. Stuff's reasonable reliance was based on the Assignment Instructions in the purchase orders, to which Juno never objected. In addition, Juno's Mr. O'Carroll encouraged Thinium's Mr. Greenberg to "wait until the goods have been received by QVC" before notifying Stuff of the NOA.[166] In other words, Mr. O'Carroll requested that

---

[162] Trial Tr. Jan. 31, 2024 [Doc. No. 133] at 98.

[163] Trial Tr. Jan. 31, 2024 [Doc. No. 133] at 135.

[164] *Westmoreland*, 380 F. Supp. 3d at 470.

[165] *Id.* (quotations and citation omitted).

[166] JX-128.

Thinium withhold pertinent information from Stuff so that Stuff would rely on the Assignment Instructions and front all materials, manufacturing, and shipping costs. Allowing Juno to retract its waiver after Stuff had fronted these costs for the Phone Chargers would be inequitable.

2.     Tortious Interference with Existing Contractual Relations

To state a claim for tortious interference with a contractual relationship, the party must show: "(1) the existence of a contractual, or prospective contractual relation between the complainant and a third party; (2) purposeful action on the part of the defendant, specifically intended to harm the existing relation, or to prevent a prospective relation from occurring; (3) the absence of privilege or justification on the part of the defendant; and (4) the occasioning of actual legal damage as a result of the defendant's conduct."[167] Courts look to the factors outlined in Section 766 of the Restatement (Second) of Torts: "(a) the nature of the actor's conduct, (b) the actor's motive, (c) the interests of the other with which the actor's conduct interferes, (d) the interests sought to be advanced by the actor, (f) the proximity or remoteness of the actor's conduct to the interference and (g) the relations between the parties."[168]

Juno claims that FYEO tortiously interfered with Thinium and Juno's existing contractual relationship by inducing Thinium to breach the Loan Documents.[169] Juno has failed to present any evidence of purposeful action on the part of FYEO to induce payment to Stuff. To the contrary, the evidence establishes that FYEO followed Thinium's direction on where to send the money, after Thinium told FYEO that Juno had consented to the Assignment Instructions.[170] Furthermore, FYEO affirmatively reached out to Mr. O'Carroll to inform Juno that it was

---

[167] *CGB Occupational Therapy, Inc. v. RHA Health Servs. Inc.*, 357 F.3d 375, 384 (3d Cir. 2004) (quoting *Crivelli v. Gen. Motors Corp.*, 215 F.3d 386, 394 (3d Cir. 2000)).

[168] *BP Env't Servs., Inc. v. Republic Servs., Inc.*, 946 F. Supp. 2d 402, 408 (E.D. Pa. 2013) (citation omitted).

[169] Juno's Am. Compl. [Doc. No. 47] ¶ 67.

[170] JX-045.

remitting payment to Stuff under the new Assignment Instructions, to which Juno did not object.[171] Juno's tortious interference claim therefore fails.

### D.      Juno's Claim Against Stuff: Tortious Interference with Existing Contractual Relations

Juno has similarly failed to present evidence that Stuff purposefully interfered with Juno's agreements with Thinium. Stuff cannot be said to have tortiously interfered with Juno's relationship with Thinium because Juno encouraged the payments to Stuff under the Assignment Instructions.

### E.      FYEO's Counterclaims against Stuff and Juno

#### 1.      Interpleader

Federal Rule of Civil Procedure 22(2) provides that: "A defendant exposed to similar liability may seek interpleader through a crossclaim or counterclaim." Similarly, 28 U.S.C. § 1335 states that:

> The district courts shall have original jurisdiction of any civil action of interpleader or in the nature of interpleader filed by any person, firm, or corporation, association, or society having in his or its custody or possession money or property of the value of $500 or more . . . if [t]wo or more adverse claimants . . . are claiming or may claim to be entitled to such money[172]

"Interpleader is an equitable remedy that may be used to achieve an orderly distribution of a limited fund . . . ."[173] However, "[i]t is a general rule that a party seeking interpleader must be free from blame in causing the controversy, and where he stands as a wrongdoer with respect to the subject matter of the suit . . . he cannot have relief by

---

[171] Trial Tr. Feb. 2, 2024 [Doc. No. 134] at 8.

[172] 28 U.S.C. § 1335(a).

[173] *Star Ins. Co. v. Cedar Valley Express, LLC*, 273 F. Supp. 2d 38, 40 (D.D.C. 2002) (citation omitted).

interpleader."[174] Since FYEO is liable for breach of contract as to the June 2019 purchase

orders, FYEO cannot invoke interpleader.

### 2.   Indemnification

FYEO seeks indemnification based on its Representation Agreement with Thinium, a

nonparty to this action. Specifically, FYEO requests that it be reimbursed out of the Retained

Funds because "Thinium is defunct and has no funds."[175] The Representation Agreement states:

> [Thinium] shall defend, indemnify and hold harmless FYEO, its affiliates and
> their respective officers, director, shareholders, employees, licensees, agents,
> successors and assigns from and against any and all Liabilities which any of them
> may incur or become obligated to pay arising out of or resulting from . . .
> [Thinium's] breach of any of its representations warranties, covenants,
> obligations, agreements or duties under this Agreement or negligence,
> recklessness or intentional misconduct.[176]

"Liabilities" is defined as:

> [A]ny and all claims of and liabilities to third parties and expenses incurred in
> connection therewith (whether or not in connection with proceedings before a
> court, arbitration panel, administrative agency, hearing examiner or other
> tribunal), including, without limitation, damages (whether direct, consequential,
> incidental, special, or punitive), judgments, awards, fines, penalties, settlements,
> investigations, costs and attorneys fees and disbursements.[177]

FYEO claims that its costs and attorneys' fees are "liabilities" under the Representation

Agreement because Thinium exposed FYEO to competing claims for payment. FYEO cannot

seek indemnification from Thinium because it is not a party to this action and FYEO has failed

---

[174] *Farmers Irrigating Ditch & Reservoir Co. v. Kane*, 845 F.2d 229, 232 (10th Cir. 1988); *Prudential Ins. Co. of Am. v. Hovis*, 553 F.3d 258, 263 (3d Cir. 2009).

[175] Def.'s Proposed Findings of Fact and Conclusions of Law [Doc. No. 138] at 58. The Court notes that FYEO's indemnification and interpleader arguments are contradictory. On the one hand, FYEO asserts that it is entitled to interpleader because it is holding onto the funds that belong either to Juno or Stuff. On the other hand, FYEO is requesting that the Court permit it to be reimbursed on its indemnification claim *out of* the retained funds, which would require said funds to belong to Thinium.

[176] JX-003 at ¶ E(1).

[177] JX-003 at ¶ E(2).

to join Thinium as a defendant. FYEO does not cite any cases for the proposition that one may

succeed on a claim for indemnification when the indemnitor is not a party to the case. Simply

because Thinium—according to FYEO—is defunct, does not entitle FYEO to use the Retained

Funds to satisfy its indemnification against a nonparty. Furthermore, common law

indemnification fails because such indemnification can only be sought by a party without active

fault on its own part.[178] The Court has found FYEO liable to Stuff, which makes indemnification

inappropriate.

### F.   Motion to Amend

Lastly, FYEO's Motion to Conform the Pleadings to the Evidence Presented at Trial is

denied. FYEO requests that "[i]n the event that the Court were to conclude that a technical defect

rendered it unable to resolve FYEO's interpleader claim . . . the Court [should] conform the

pleadings to the evidence presented at trial and enter a declaratory judgment claim declaring the

rights and liabilities of the parties to the funds held by FYEO."[179] Such an amendment is

inappropriate because the Court has denied FYEO's interpleader claim on the merits, not on

jurisdictional defect, and has already determined that Stuff is entitled to the retained funds.

### III.   CONCLUSION

Strikingly missing from this litigation is Thinium—the company which has

simultaneously been at the center of this dispute, but never a party to this action. In an ideal

world, FYEO, Stuff, and Juno, three sophisticated business organizations, would have received

additional profits from their part in the sale of the Phone Chargers. The Retained Funds at issue

---

[178] *Bank v. City of Philadelphia*, 991 F. Supp. 2d 523, 530 (E.D. Pa. 2014) ("The common law right of indemnity ensures to a person who, *without active fault on his own part,* has been compelled, by reason of some legal obligation, to pay damages occasioned by the initial negligence of another, and for which he himself is only secondarily liable.") (citations omitted and emphasis added).

[179] FYEO's Mot. [Doc. No. 150] at 2.

in this case are only a fraction of what each party believes it is entitled to receive. Unfortunately, in business, the best of intentions does not guarantee that parties will make up their losses.

The Court has carefully considered the trial testimony, exhibits, and the arguments of counsel and, as detailed above, concludes that FYEO breached a contract to remit the June 2019 receivables to Stuff. The evidence does not support success on any of the other parties' claims. The Court finds that Stuff is entitled to the retained funds of approximately $453,000.00. An Order will be entered.